## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

LOONEY RICKS KISS ARCHITECTS, INC.

CIVIL ACTION NO. 07-0572

VERSUS

JUDGE S. MAURICE HICKS, JR.

STEVE H. BRYAN, ET AL.

MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court are two motions:  a Motion for Summary Judgment (Record Documents 615) filed by Defendant Chartis Specialty Insurance Company ("Chartis")[1] and a Motion for Summary Judgment or Alternative Motion for Partial Summary Judgment (Record Documents 624) filed by Defendant Tudor Insurance Company ("Tudor").  Plaintiff Looney Ricks Kiss Architects, Inc. ("LRK") opposes both motions.

The motions seek dismissal of all claims on the grounds that the insurance policies sued upon do not provide coverage for the alleged copyright infringement claims made in this lawsuit.  Alternatively, Tudor moves for partial summary judgment on the issue of insurance coverage for LRK's claims to any profits of Tudor's insured, Grand Pointe Apartments, LLC, under Section 504(b) of the Copyright Act.  Tudor argues such relief is not insured under its policy.  For the reasons which follow, the motions are **DENIED**.

---

[1]Chartis originally filed a Rule 12(b)(6) Motion to Dismiss.  See Record Document 615.  At the January 9, 2014 status conference, the Court advised the parties that it was converting the Rule 12(b)(6) motion to a Rule 56 motion.  See Record Document 694.  The Court allowed supplemental briefing on both Chartis' and Tudor's motions.  See id.

**BACKGROUND**[2]

This civil action is a claim on behalf of LRK, an architecture firm, for infringement of copyrights in the design of an apartment complex.  The claim arises out of one or more of the Defendants' use of the design in connection with apartment complexes in Baton Rouge, Shreveport and Lafayette, Louisiana.

The only Defendants remaining in this litigation are CLA, LLC, Island Park Apartments, LLC, Grand Pointe Apartments, LLC (sometimes referred to as "Grand Pointe"), and their respective insurers.  Each Defendant contests the validity of LRK's copyright registrations for its architectural works and technical drawings.  All Defendants also assert multiple defenses and limitations on LRK's claim.  State Farm Fire & Casualty Company intervened in this action seeking a declaration that there is no duty to defend CLA, LLC and that there is no coverage under its policies arising out LRK's claim for copyright infringement.

LRK has asserted direct actions against two insurance companies, Tudor and Chartis.  Tudor and Chartis both issued policies of insurance to Grand Pointe.  LRK alleges that these policies provide coverage for the acts of copyright infringement that it alleges were committed by Grand Pointe.

Grand Pointe is a company owned by Bryan Investments, LLC. Grand Pointe purchased land in Lafayette, Louisiana to be used for construction of apartments. Grand Pointe contracted with architect Stephen Hill to prepare construction drawings for the

---

[2]Much of the information contained in the Background Section is drawn from the Amended Joint Pretrial Order (Record Document 681).  Facts and other information drawn from other sources are noted by a specific citation to the record.

apartments to be constructed in Lafayette.   Grand Pointe contracted with Bryan Construction Company to build the apartments.  Grand Pointe contracted with the Bryan Company to operate the apartments.   The apartments were named the Grand Pointe Apartments.  In February 2009, Grand Pointe sold the Grand Pointe Apartments to Grand Pointe Apartments-NE Limited Partnership.

Chartis issued commercial umbrella policy no. EBU 2345707 to Grand Pointe  for the policy period April 17, 2008 to April 17, 2009.  <u>See</u> Record Document 615-2.  The Chartis policy is an umbrella policy which provides potential coverage inexcess of Grand Pointe's underlying primary insurance provided by Tudor, subject to all terms, conditions, limitations, and exclusions in the Chartis policy.  Tudor issued a commercial general liability policy no. GLO0005715 to Grand Pointe for the policy period April 17, 2008 to April 17, 2009.  <u>See</u> Record Document 624-2.  LRK alleges that these policies provide coverage for the acts of copyright infringement that it alleges were committed by Grand Pointe.  Chartis and Tudor deny that they owe any coverage for any alleged acts of copyright infringement by Grand Pointe or for any claims asserted or damages sought by LRK.  The only type of coverage at issue for Chartis and Tudor in this case is coverage for "advertising injury."

The key provisions of the Chartis policy are as follows:

**I.     Coverage**

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an Insured Contract because of . . . **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world.

. . .

IV.     **Definitions**

    A.     **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

        . . .

        4.     Infringement of copyright, title or slogan.

   . . .

    H.     **Occurrence means:**

        . . .

        (3)     As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising Injury**.     All damages that arise from the same or related injurious or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

. . .

V.      **Exclusions**

   This insurance does not apply to:

   . . .

    K.     **. . . Advertising Injury:**

        . . .

        2.     Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

        . . .

Record Document 615-2.  The key provisions of the Tudor policy are as follows:

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

1.     **Insuring Agreement**

       . . .

       (b)     This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2.     **Exclusions**

       This insurance does not apply to:

       a.     "Personal or advertising injury":

              (1)     Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal or advertising injury";

              . . .

              (3)     Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

              . . .

**SECTION V - DEFINITIONS**

1.     "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

. . .

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
       . . .

       g.     Infringing upon another's copyright, trade dress or slogan in your "advertisement."

Record Document 624-2.[3]

## LAW AND ANALYSIS

## I.     Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

---

[3]The pertinent endorsement provisions from the policies will be set forth *infra.*

II.     **Interpretation of Insurance Policies.**[4]

The parties agree that Louisiana law governs the interpretation of the insurance policies at issue in this case.  "An insurance policy is a contract between parties and should be construed according to contract principles."  Michelet v. Scheuring Sec. Servs. Inc., 680 So.2d 140, 147 (La.App. 4 Cir. 1996).  "When the language of a policy is clear and not ambiguous, the insurance contract must be enforced as written.  When the wording is clear, the courts lack the authority to alter or change the terms of the policy under the guise of interpretation."  Id.  "In interpreting insurance contracts the judicial responsibility is to determine the parties' common intent.  Such intent is to be determined according to the ordinary, plain and popular meaning of words used in a policy."  Id.  "Words in an insurance contract must be ascribed their generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning."  In re St. Louis Encephalitis Outbreak, 939 So.2d 563, 566 (La.App. 4 Cir. 2006).

"The parties are free to select the types of risks to be covered."  Michelet, 680 So.2d at 147.  "A policy should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict the provisions beyond what the parties contemplated."  Id.  "Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume."  La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1994).

---

[4]The legal standards relating to the interpretation of insurance policies have been drawn, for the most part, from the United States Court of Appeals for the Fifth Circuit's opinion in this matter.  See Looney Ricks Kiss Architects, Inc. v. State Farm Fire & Cas. Co., 677 F.3d 250, 255-256 (5th Cir. 2012).

"Ambiguous or equivocal provisions which seek to narrow the insurer's obligations are construed against the insurer."  <u>Michelet</u>, 680 So.2d at 147.  "The insurer has the burden of proving that a policy claimed loss falls within [an] exclusion."  <u>Everett v. Philibert</u>, 13 So.3d 616, 618 (La.App. 1 Cir. 2009).

**III.    Arguments Advanced by Both Tudor and Chartis.**

A.    <u>Known Loss or Fortuity Doctrine</u>.

LRK filed its Complaint in this matter on March 27, 2007.  <u>See</u> Record Document 1.  On December 12, 2007, LRK filed its First Amended Complaint and added Grand Pointe as a defendant.    <u>See</u> Record Document 65.    Grand Pointe answered and filed counterclaims against LRK on February 28, 2008.  <u>See</u> Record Document 80.  The Chartis and Tudor policy periods did not commence until April 17, 2008, approximately six weeks later.  <u>See</u> Record Documents 615-2 & 624-2.  Based on this time line, both Chartis and Tudor argue that there can be no question that Grand Pointe had actual and undisputable knowledge of the claims and allegations asserted by LRK in this lawsuit prior to the issuance and inception of the two policies.  Thus, the insurers seeks exclusion of coverage under the "fortuity " or "known loss" doctrine.

Chartis and Tudor point the Court to two Fifth Circuit decisions discussing the fortuity doctrine.  In <u>RLI Ins. Co. v. Maxxon Sw. Inc.</u>, 108 F. App'x 194 (5th Cir. 2004), the Fifth Circuit explained:

> The fortuity doctrine relieves insurers from covering certain behaviors that the insured undertook prior to purchasing the policy.  Because the purpose of insurance is to protect insureds against unknown, or fortuitous, risks, fortuity is an inherent requirement of all risk insurance policies.  Combining the principles of known loss and loss in progress, the fortuity doctrine holds that insurance coverage is precluded where the insured is or should be aware of an ongoing progressive or known loss at the time the

policy is purchased.

> If an insured knows, or should have known, at the time it purchased the insurance policy, that its current behavior is wrongful and could result in liability, it effectively removes the risk element inherent in insurance, and therefore a Texas court will not require the insurer to pay.

Id. at 198 (internal citations and quotations omitted); see also Ryland Grp., Inc. v. Travelers Indem. Co. of IL, No. A-00-CA-233, 2000 WL 33544086, *7 (W.D. Tex. Oct. 25, 2000) ("The fortuity or known loss doctrine stands for the proposition that insurance coverage is precluded where the insured is, or should be, aware of an ongoing progressive loss or known loss at the time the policy is purchased.  Thus, an insured cannot insure against something that has already begun and which is known to have begun.").  The rationale of these cases is clear; however, both cases are grounded in Texas common law, not Louisiana law.

In Brignac v. City of Monroe, 936 So. 2d 272 (La. App. 2 Cir. 2006),[5] a Louisiana appellate court reasoned:

> We first note that the jurisprudence is well-settled that the purpose of insurance is to protect insureds against unknown, fortuitous risks, and, moreover, that the purpose of insurance policies is not to insure liability incurred prior to being named in a policy.
> . . . *While Louisiana does not apply the "known loss" doctrine per se*, the holding in each of the respective (aforementioned) cases is not meant to stand for the proposition that an actual, known loss predating an insurance policy is somehow covered.  Quite the contrary. . . .  [N]o insurance company would have issued a policy covering an accident which had occurred prior to his applying for insurance.  Such a loss is uninsurable.  Anything otherwise is contrary to the fundamentals of Louisiana law and, more so, to the fundamentals of sound business practice or even common sense.

---

[5]The Louisiana Supreme Court denied the writ application.  See Brignac v. City of Monroe, 936 So.2d 272  writ denied, 2006-2154 (La. 12/8/06), 943 So. 2d 1095 (La. 2006) & 943 So.2d 1096 (La. 2006).

Id. at 277-278 (internal citations and quotations omitted) (emphasis added).  Brignac, and the cases cited therein, involved a single accident, not multiple acts of copyright infringement as alleged in this matter.  In light of the factual distinction between Brignac and the instant matter and further noting the ambiguity in the Brignac decision, i.e., "while Louisiana does not apply the 'known loss' doctrine per se," this Court is unwilling to make the Erie guess that the Louisiana Supreme Court would adopt the Texas common law fortuity doctrine.[6]  Summary judgment in relation to the known loss or fortuity doctrine is, therefore, **DENIED** as a matter of law.

 B. The First Publication Exclusion.

 Both the Chartis and Tudor policies contain a first publication exclusion providing that the insurance does not apply to "advertising injury . . . arising out of oral or written publication of material whose first publication took place before the beginning of the policy

---

 [6]In Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254 (5th Cir. 2003), the Fifth Circuit discussed "Erie guesses":

> In the absence of a final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case. . . .
>  "Our ultimate 'Erie guess' requires that we employ the appropriate Louisiana civilian methodology to decide the issues presented the way that we believe the Supreme Court of Louisiana would decide them."  Under Louisiana's Civil Code, the only authoritative "sources of law are legislation and custom."  Thus, in Louisiana, courts must look first and foremost to the state's "primary sources of law: the State's Constitution, codes, and statutes." . . .  Therefore, while it is true that we will not disregard Louisiana appellate court decisions unless we are convinced "by other persuasive data that the highest court of the state would decide otherwise," "particularly if numerous decisions are in accord on a given issue–the so-called jurisprudence constante–we are not strictly bound by them."

Id. at 260-261.

period." Record Documents 615-2 & 624-2.  Chartis and Tudor bear the burden of proving that LRK's claimed loss falls within this exclusion.  See Everett, 13 So.3d at 618.

As noted by the insurers, the focus of the exclusion is the alleged infringing material.[7]  See Record Document 709 at 17.  Chartis and Tudor contend that *all* of the infringing material was published prior to the policy effective date in April 2008.  While the record establishes that much, and possibly all, of the infringing material was published prior to April 2008, the Court believes it is required to examine the alleged infringing material used in advertising prior to April 17, 2008 and then compare such to any material first published during the relevant policy periods of Tudor and Chartis.  The Court is particularly interested in comparing the advertising brochure prepared to sell the Grand Pointe Apartments, as the record indicates that such brochure was not published prior to April 2008.[8]  Therefore, summary judgment as to the first publication doctrine must be **DENIED**, as genuine disputes of material fact exist.

**IV.    Arguments Advanced by Tudor.**

A.    Exclusion for Certain Business/Marketing Conduct.

---

[7]LRK contends that the apartment buildings themselves are infringing advertisement, but can not be considered "oral or written publication of materials" under the exclusion. Conversely, Tudor maintains that a building is not an advertisement under the policy's definitions.

[8]See Everett Associates, Inc. v. Transcontinental Ins. Co., 57 F.Supp.2d 874 (N.D.Cal.1999) (holding that the first publication exclusion did not bar insured from coverage where each advertisement would be considered separately for purposes of patent infringement and some of the advertisements were published after the commencement of the policy period); Int'l Commc'n Materials, Inc. v. Employer's Ins. of Wausau, No. 94-1789, 1996 WL 1044552 (W.D.Pa. May 29, 1996) (holding that the first publication exclusion does not preclude coverage for material published within the policy period, even if similar to previously published material, or if part of an "advertising campaign").

The Tudor policy contains an endorsement entitled "Exclusion for Certain Business/Marketing Conduct," which provides, in pertinent part, as follows:

This endorsement . . . forms a part of the policy to which is it attached.

EXCLUSION FOR CERTAIN BUSINESS/MARKETING CONDUCT

In consideration of the premium charged, it is hereby understood and agreed that the insurance under this policy DOES NOT APPLY to claims and claim expenses arising out of, in connection of [sic] conjunction with, or in any way involving the following conduct in the course of any insured's marketing activities:

. . .

(2)   Any misappropriation, infringement, or unauthorized use of any name, trademark, copyright, trade name, trade dress, service mark or service name, advertising idea, style of doing business, title, slogan, format, idea, character, character name, characterization, plot, musical composition, performance, logo, art work, graphic representation, photograph, or other similar concept, practice, or design.

Record Document 624-2 at TUDOR0036.  Tudor argues that the business/marketing exclusion is clear and unambiguous and that "any and all potential coverage" for advertising injury under Coverage B of the policy, namely "infringing upon another's copyright . . . . in . . . advertisement," is negated by this exclusion.  Id. at TUDOR0013-0020.

Tudor's policy expressly provides coverage for "advertising injury . . . arising out of infringing upon another's copyright in your advertisement."  Id. at TUDOR0020.  The endorsement excludes "business/marketing conduct," and more specifically, "marketing activities."  Id. at TUDOR0036.  While "advertisement"[9] is defined in the policy, "business/marketing conduct" and "marketing activities" are not.  Despite its protestations to the contrary, Tudor's interpretation of the exclusion seems to suggest that

---

[9]See supra at 5.

"advertisement" is synonymous with "business/marketing conduct" and "marketing activities." Additionally, because some of the key terms are undefined, the Court finds the exclusion equivocal. Thus, Tudor's argument that the term "marketing" is a term broader and inclusive of "advertisements" fails in light of controlling law that "ambiguous or equivocal provisions which seek to narrow the insurer's obligations are construed against the insurer." Michelet, 680 So.2d at 147. Louisiana Civil Code Article 2050 also states that "each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."

Moreover, the Fifth Circuit has distinguished "advertising" and "marketing." In Am.'s Recommended Mailers Inc. v. Maryland Cas. Co., 339 F. App'x 467 (5th Cir. 2009), the Fifth Circuit distinguished "advertising materials and marketing techniques used to promote a product's sale." Id. at 469. In Phototron Corp. v. Eastman Kodak Co., 842 F.2d 95 (5th Cir. 1988), the Fifth Circuit reasoned that "Colorwatch is not advertising by the wholesale photofinishers; it is a marketing program aimed at the public through retailers but undertaken by a supplier of materials to wholesale photofinishers." Id. at 101. These cases illustrate that advertising points to specific communications, while marketing refers to techniques or forms of conduct. This distinction is also supported by the Merriam-Webster online dictionary definition of "marketing":

1. a: the act or process of selling or purchasing in a market

   b: the process or technique of promoting, selling, and distributing a product or service

2. an aggregate of functions involved in moving goods from producer to consumer.

http://www.merriam-webster.com/dictionary/marketing.[10]  Therefore, based on the foregoing analysis, summary judgment in favor of Tudor on the basis of the Exclusion for Certain Business/Marketing Conduct is **DENIED**.

B.    The Knowing Violation of Rights of Another Exclusion.

The Tudor policy does not apply to advertising injury "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict advertising injury."  Record Document 624-2 at TUDOR0013.  Because the Tudor policy was not issued to Grand Pointe until after the filing of LRK's lawsuit in 2007 and after Grand Pointe filed responsive pleadings in February 2008, Tudor contends that "there can be no question that EVERY SINGLE ACT committed by or on behalf of Grand Pointe during the [p]olicy period was done with actual and indisputable knowledge of the claims and allegations asserted by LRK in this lawsuit."  Record Document 624-1 at 25.  Tudor maintains that Grand Pointe cannot possibly claim ignorance of the alleged copyright infringement issues because it had already been sued as of the date of the policy inception (April 17, 2008).  See id.  Finally, Tudor argues that there is no subjective intent requirement in the exclusion.  See Record Document 746 at 7.  Conversely, LRK argues that an insurer must prove that its insured had a subjective intent to violate the rights of another, that is, that Steve Bryan and Grand Pointe committed a knowing violation of LRK's copyrights.

The "knowing violation of rights exclusion" has been classified as an intentional

---

[10]The Louisiana Supreme Court will look to dictionary definitions for the generally prevailing meaning of a term that is not specifically defined in a contract.  See Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 581 (La. 2003).

conduct exclusion.  See 2 Practical Tools for Handling Insurance Cases § 13:44, citing Educational Training Systems, Inc. v. Monroe Guar. Ins. Co., 129 S.W.3d 850, 852 (Ky. Ct. App. 2003).  "The insured must have the requisite knowledge that the intended act will cause harm and will violate the rights of another."  See id.  More specifically, courts have refused to apply the exclusion where the insured could be liable even if the infringement was inadvertent, negligent, or reckless.  See Citizens Insurance Company v. Pro-Seal Service Group, Inc., 710 N.W.2d 547 (2005) (trademark infringement); see also Orlando Nightclub Enterprises, Inc. v. James River Ins. Co., No. 6:07-cv-1121, 2007 WL 4247875 (M.D. Fla. Nov. 30, 2007).[11]

An infringer's state of mind may be "willful, knowing, or merely innocent."  Ram's

---

[11]In analyzing the somewhat similar "knowledge of falsity exclusion," the Fifth Circuit reasoned:

> [The insurer] argues that KFA's complaint in the Underlying Lawsuit is replete with allegations that Ryland knowingly infringed on KFA's copyrighted materials.  Accordingly, Lumbermens contends that the knowledge of falsity exclusion clearly bars any duty to defend Ryland against the Underlying Lawsuit.  Ryland contends that the exception would not apply in the instant case because willful conduct is not a necessary element of copyright infringement, and nothing in KFA's complaint forecloses the possibility that Ryland's alleged infringement was negligent or inadvertent.
> . . . The issue presented here, however, is whether the complaint relies exclusively on allegations of intentional conduct, or whether a fair reading of the KFA complaint shows that KFA was pleading the claims of intentional infringement in the alternative to allegations that Ryland infringed KFA's copyrights by some means less than an intentional state of mind. . . . [T]his exclusion only applies if KFA's complaint exclusively alleges willful infringement.
> . . . Because KFA's complaint alleged both intentional and negligent or inadvertent infringement, the knowledge of falsity exclusion will not act to exclude Lumbermens from its duty to defend in this case.

Ryland Grp., Inc., No. A-00-CA-233, 2000 WL 33544086, *7.  State Farm has previously asserted this exclusion in a Motion for Summary Judgment (Record Document 293 at 22).

Horn Music v. Foundry Entertainment, Inc., No. 91-2582, 1992 WL 125344 (E.D. La. May 22, 1992).  The Fifth Circuit has long held that "even an unwitting purchaser who buys a copy in the secondary market can be held liable for infringement if the copy was not the subject of a first sale by the copyright holder infringer."  American Intern. Pictures, Inc. v. Foreman, 576 F.2d 661, 664 (5th Cir. 1978).  In Palmetto Builders & Designers, Inc. v. Unireal, Inc., 342 F. Supp.2d 468 (D.S.C. 2004), the court granted a preliminary injunction against the sale of infringing houses because the resale by even innocent or unwitting purchasers would constitute additional acts of infringement.  See id. at 473-474, citing Foreman, 576 F.2d at 664.   "Copyright infringement actions, like those for patent infringement, ordinarily require no showing of intent to infringe."  Chavez v. Arte Publico Press, 204 F.3d 601, 607 (5th Cir. 2000).

Here, LRK has not alleged any knowing violation.  In fact, it does not need to allege any knowing violation to prove copyright infringement.  Moreover, there are fact issues surrounding subjective intent in this matter.  While this Court rejected the argument that Steve Bryan was a co-author in December 2010, there is competent summary judgment evidence that Steve Bryan, and by extension, Grand Pointe, believed he was entitled to use the Island Park (Memphis) plans without further involvement of LRK.  See Record Documents 463 & 465; Record Document 636, Exhibit A.  He further claimed to be unaware of LRK's ownership of copyrights in the plans.  See Record Document 636, Exhibit A.  Additionally, the trial deposition testimony of James Bryson and Stephen Hill further reveals that Steve Bryan believed he was a co-author/co-owner with LRK.  See Record Document 728, Exhibit H at 59, Exhibit I at 173-175.  Accordingly, based on the foregoing analysis, summary judgment in favor of Tudor is **DENIED** as to the knowing violation of

rights of another exclusion.

**V.     Arguments Advanced by Chartis.**

     A.     <u>Residential Construction Operations Exclusion</u>.

Chartis contends that LRK's claims are excluded under the Residential Construction

Operations Exclusion because all of LRK's claims against Grand Pointe arise out of the

construction of a residential apartment complex.  The policy provides:

**Endorsement No. 7
Commercial Umbrella Policy Form
<u>Residential Construction Operations Exclusion Endorsement</u>**

The policy is amended as follows:

**Section V.   Exclusions** is amended to include the following additional exclusion:

This insurance does not apply to:

**Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of **Residential Construction Operations**. This exclusion applies whether or not the **Residential Construction Operations** have been completed or are ongoing.

**Section IV.   Definitions** is amended to include the following additional definition:

**Residential Construction Operations** means any activity by or on behalf of any **Insured**, in any capacity, regarding, related to, or in support of, any construction of residential premises including, but not limited to, detached single family houses, attached single family houses or multiple unit residential structures, whether as condominiums, cooperatives, *rental apartments*, interval ownership dwellings, fee simple ownership or in any other form.

Record Document 615-2 at 36 (emphasis added).  Chartis maintains that this exclusion is

unambiguous and argues that LRK's claims are excluded because they all arise out of and

relate to Grand Pointe's use of LRK's copyrighted works in the construction of the Grand

Pointe Apartments, a 266 unit residential apartment development.  Chartis further notes that the only purpose Grand Pointe had for allegedly misappropriating LRK's plans was to build the apartments, and all of LRK's claims for copyright infringement against Grand Pointe stem from and began with the construction of these apartments.  Thus, Chartis argues that LRK's claims for the misappropriation of its copyrighted works for use in the construction of the Grand Pointe apartments are clearly "regarding, related to, or in support of, any construction of residential premises."

The Court finds that Chartis' reading of the Residential Construction Operations Exclusion is broader than the plain language of the provision.  Under Louisiana law, "an insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."  Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 763 (La. 1994).  Courts should also be hesitant to construe a policy such that it is unclear what, if anything, would be covered.  See In re St. Louis Encephalitis Outbreak in Ouachita Parish, 939 So.2d at 567 n. 3.

The undisputed record evidence shows that the construction of the Grand Pointe Apartments was completed long before the Chartis policy period began in April 2008.  Certificates of occupancy were issued beginning in 2006.  See Record Document 733, Exhibit E.  The certificate of substantial completion was issued on March 13, 2007.  See id., Exhibit F.  Chartis' reading of the exclusion would essentially eliminate any coverage that it sold to an insured who constructed, owned, operated, and then ultimately sold an apartment complex.  The Court believes that the policy construction offered by Chartis makes the coverage illusory and would lead to an absurd conclusion.  Summary judgment

on the basis of the Residential Construction Operations Exclusion is, therefore, **DENIED**.

      B.    <u>No Employee or Representative of Grand Pointe Participated in the Marketing or Advertising of the Grand Pointe Apartments.</u>

      Chartis also seeks summary judgment on coverage because it contends that the trial record now definitely shows that no employee or representative of Grand Pointe had anything to do with the marketing or advertising of the apartments. <u>See</u> Record Document 706 at 20-21. Chartis argues that it is undisputed that Diana Spence, the property manager for all three of Bryan's Louisiana apartment complexes, and Ms. Rebecca Runyan Bryan, who handled marketing for all of the multi-family developments constructed by the Bryan Company, were the only persons involved in the advertising and marketing of the Grand Pointe Apartments. <u>See</u> Record Document 706 , Exhibit L at 101-103. Chartis argues that all advertising and marketing for the Grand Pointe Apartments was done by employees of the Bryan Company, not its insured. Thus, according to Chartis, the Bryan Company was the only entity that published advertising and marketing material and any infringement related to such materials is not covered by the Chartis policy.

      The deposition of Steve Bryan reveals that the Bryan Company was the real estate management company for Grand Pointe Apartments, LLC. <u>See</u> Record Document 733, Exhibit G at 25. The Bryan Company was the management company for all of Steve Bryan's multi-family developments. <u>See id.</u> at 13. As manager, The Bryan Company was responsible for all advertising by the Bryan apartment developments, including Grand Pointe Apartments. <u>See id.</u>, Exhibit H at 16, 19. There is also evidence in the record regarding the management agreement between apartment entity CLA, LLC and The Bryan Company, specifically describing CLA, LLC as the "owner" and The Bryan Company as the

"agent."  See id., Record Document I (Deposition of Thomas Gregory Murphey) at 27-31.

Mr. Murphey further testified that the arrangements were the same for Grand Pointe

Apartments, LLC and The Bryan Company.  See id. at 37.

Louisiana Civil Code Article 3020 provides that "[t]he principal is bound to perform

the contract that the mandatary, acting within the limits of his authority, makes with a third

person."  See also Karam v. Travelers Ins. Co., 813 F.2d 751, 752 (5th Cir. 1987)

("Whether a person has authority to bind a corporation is essentially an issue of agency.").

In AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc., 385 So.2d 426 (La. App.1 Cir.

1980), the court discussed agency under Louisiana law:

> An agency is created expressly by the oral or written agreements between the parties.  It is created by implication when, from the nature of the principal's business and the position of the agent within that business, the agent is deemed to have permission from the principal to undertake certain acts which are reasonably related to the agent's position and which are reasonable and necessary concomitants of the agent's express authorization. Implied authority connotes permission from the principal for the agent to act, though that permission is not expressly set forth orally or in writing.  Generally, one should look from the viewpoint of the principal and the agent to determine whether the agent has implied authority.
> The concept of apparent authority only comes into play when the agent has acted beyond his actual authority and has no permission whatsoever from his principal to act in such a manner.  The principal will be bound for such actions if he has put his agent in such a position or has acted in such a manner as to give an innocent third person the reasonable belief that the agent has authority to act for the principal.

Id. at 429.

In light of the aforementioned deposition testimony and the legal principles stated

above, the Court finds, at a minimum, an implied agency relationship between The Bryan

Company and Grand Pointe Apartments, LLC.[12]  The further notes that Grand Pointe's application for insurance coverage was faxed from The Bryan Company.  See Record Document 706-3.  Additionally, the Chartis policy defines "insured" as including "any person, other than one of your employees, or organization while acting as your real estate manager."  See Record Document 615-2 at 12.  Thus, it appears that the Bryan Company might actually be an insured under the policy.  Accordingly, Chartis' argument that no employee or representative of Grand Pointe had anything to do with the marketing or advertising of the apartments does not preclude coverage for Grand Pointe's alleged advertising injury.  Summary judgment must be **DENIED**.

## VI.    Tudor's Alternative Motion for Partial Summary Judgment.

LRK's claim for monetary relief is based on 17 U.S.C. § 504.  Section 504(b) provides:

> The copyright owner is entitled to recover the actual damages suffered . . . as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove . . . deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).  Tudor argues that "to the extent LRK is seeking a monetary award in the form of profits of Grand Pointe, such amounts are not covered under the policy as

---

[12]In the Amended Joint Pretrial Order (Record Document 681), the following fact was stipulated:

> The Bryan Company collected rents, *acted as an agent* for the collection of rents and/or had supervisory capacity over the collection of rents for Grand Pointe Apts.

Id. at D(¶ 66) (emphasis added).

disgorged profits are not 'damages,' nor are they due to any 'injury' to LRK as those terms are set forth in the Tudor policy."  Record Document 624-1 at 31.  Tudor contends that the policy only provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of injury" and that disgorged profits as a result of an illegal act such as copyright infringement do not fit this description.  Id. at 32.  Stated another way, Tudor maintains that disgorgement of profits is not compensation for an injury, but rather is in the nature of restitution or equitable relief, i.e., a penalty imposed on the infringer.  See id.

The Court rejects Tudor's argument that disgorgement remedies are not damages under the policy.  The term "damages" is not defined in the Tudor policy.  Louisiana Civil Code Article 2047 states that "words of a contract must be given their generally prevailing meaning."  In Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 581 (La. 2003), the Louisiana Supreme Court looked to Black's Law Dictionary for the meaning of a term in an insurance policy.  Likewise, the Fifth Circuit looked to Black's Law Dictionary for the meaning of "damages" in insurance policies:

> A pecuniary compensation or indemnity which may be recovered in the courts by any person who has suffered loss, detriment or injury, whether to his person, property, or rights, through the unlawful act or omission of negligence of another.

Aetna Cas. And Surety Co. v. Hanna, 224 F.2d 499, 503 (5th Cir. 1955).  Under this definition, infringer profits are pecuniary compensation to LRK for injury to its rights as a copyright owner and are "damages" within Tudor's advertising injury coverage.

The Court was also persuaded by the reasoning of the Eleventh Circuit in Limelight Products v. Limelite Studios, Inc., 60 F.3d 767 (11th Cir. 1995).  In analyzing "ill-gotten

profits" under the Lanham Act (trademark infringement), the Limelight court held:

> We find no merit to the argument that ill-gotten profits are not damages covered by the insurance policies. . . .
>
> Moreover, Courts in this Circuit have interpreted Lanham's damages provision to embody both actual damages under 15 U.S.C. 1117(a)(2) and presumed damages (or ill-gotten profits) under 15 U.S.C. 1117(a)(1).  That is, while Lanham specifies the plaintiff may recover its actual damages in addition to the defendant's ill-gotten profits, this Circuit recognizes ill-gotten profits as merely another form of damages that the statute permits to be presumed because of the proof unavailability in these actions.
>
> When Gulf and Select issued these policies they knew of the Lanham Act, were on notice plaintiffs could recover ill-gotten profits, and must be held to have intended to cover these damages because they did not exclude them.  Applying Florida law[13] to construe the policy, we interpret "damages" broadly in favor of the insureds because Gulf and Select wrote the policies, selected that term, and chose not to define or restrict it.  We refuse to allow Gulf and Select to deny coverage for the very injury they took payment to insure against.  Such amounts clearly are covered by the policies issued.

Id. at 769 (internal citations omitted).  This reasoning is equally applicable to the instant matter in the context of the Copyright Act.  Accordingly, Tudor's alternative motion for partial summary judgment that its policy provides no coverage for LRK's claims to Grand Pointe's profits is **DENIED**.

## CONCLUSION

Based on the foregoing analysis, the Motions for Summary Judgment (Record Document 615 & 624) filed by Chartis and Tudor be and are hereby **DENIED**.  The motions are **DENIED AS A MATTER OF LAW** as to the known loss or fortuity doctrine; the exclusion for certain business/marketing conduct; the knowing violation of rights of another exclusion; the residential construction operations exclusion; the argument that no employee or representative of Grand Pointe participated in marketing or advertising of the Grand

---

[13]Under Louisiana law, "ambiguous or equivocal provisions which seek to narrow the insurer's obligations are construed against the insurer."  Michelet, 680 So.2d at 147.

Pointe Apartments; and the argument that disgorged profits are not damages under the Tudor policy.  The motion is **DENIED** due to the existence of genuine disputes of material fact as to the first publication exclusion.

An order consistent with the terms of the instant Memorandum Ruling shall issues herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 10th day of March, 2014.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE